**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**DARIAN D. JAMES,**

        **Petitioner,**

**v.**                                    **Case No. 8:15-cv-2332-T-36AAS**
**SECRETARY, DEPARTMENT**
**OF CORRECTIONS**,

        **Respondent.**
_____/

## ORDER

Darian Darneill James, a Florida prisoner, filed a 28 U.S.C. § 2254 petition for writ of habeas corpus challenging his convictions for racketeering, conspiracy to traffic in cocaine, trafficking in cocaine, and felon in possession of a firearm, rendered in the Thirteenth Judicial Circuit for Hillsborough County. (Dkt. 1). Respondent responded. (Dkt. 19). James did not file a reply. After review, the petition will be denied.

### Procedural History

In 2005, the State charged Darian James ("Darian or James") [1] and 15 codefendants with racketeering and other offenses in a 20-count information. James' charges were severed from those of the co-defendants, three of whom, Sidney Deloch, Tamiko James and Christine Pace, testified as state witnesses at James' 2007 jury trial.

_____

[1] The Court refers to the Petitioner by his first name in some instances to differentiate him from his family members.

1

The state trial court granted a judgment of acquittal on count three, trafficking in cocaine. The jury found James guilty of racketeering (count one), conspiracy to commit racketeering (count two), conspiracy to traffic in cocaine (count four), and trafficking in cocaine (count ten). As to count eleven, felon in possession of a firearm, the parties agreed before trial to sever the "felon" portion. The jury found James guilty of possession of a firearm, and he stipulated that he was a convicted felon. The state trial court sentenced James to twenty years in prison on counts one, two, four, and ten, concurrently, with minimum mandatory prison terms of fifteen and seven years on counts four and ten, respectively. The state trial court sentenced James to five years in prison on count eleven, concurrently. (Dkt. 20, Resp. Ex. A11). On March 17, 2010, the state appellate court *per curiam* affirmed the convictions and sentences. *James v. State*, 30 So. 3d 501 (Fla. 2d DCA 2010).

The state appellate court granted, in part, James' petition alleging ineffective assistance of appellate counsel. The state appellate court reversed the conviction on count two, conspiracy to commit racketeering and remanded for the trial court to strike the conviction. *James v. State*, 61 So. 3d 492, 494 (Fla. 2d DCA 2011). On August 8, 2011, the state trial court rendered an amended sentence. (Dkt. 20, Resp. Ex. D).

On June 12, 2012, the state appellate court dismissed James' second petition alleging ineffective assistance of appellate counsel. *James v. State*, 93 So. 3d 1027 (Fla. 2d DCA 2012). The state postconviction court denied James' May 10 and December 7, 2012, motions for postconviction relief, which the state appellate court *per curiam*

2

affirmed, *James v. State*, 175 So. 3d 295 (Fla. 2d DCA 2015), and issued the mandate on July 7, 2015. The state appellate court denied James' March 8, 2015 petition for writ of habeas corpus, *James v. State*, 210 So. 3d 667 (Fla. 2d DCA 2016), and his motion for rehearing on June 28, 2016.

In a prior order (Dkt. 14), the Court determined that the instant petition is timely.

## The Facts[2]

Darian James' charges arose from an undercover investigation of suspected drug trafficking activities of members of the James family. Police obtained information about the James family in 2000, and in May and July 2005, confidential sources provided information on individuals connected with the organization. Initially, police identified seven to nine of the individuals, including Darian James, who were involved. During the course of the investigation, police identified three apartments connected with the organization. Darian James rented one of the apartments, located on Del Ray Court in the Brookside Apartments, and had a cellular phone assigned to his name at that location.

Darian James' mother was the subscriber for both his cellular phone and the cellular phone of James' cousin, Sidney Deloch. Police determined from controlled telephone calls with a confidential source that Deloch was using his cellular phone to conduct narcotics sales. In recorded calls with the confidential source, Deloch agreed to sell the confidential source 125 grams of crack cocaine for $3200. On August 22,

---

[2]The factual summary derives from the briefs on direct appeal, the hearing on the wiretap motion, and the trial transcript.

2005, Deloch sold the source the crack cocaine.  The confidential source also performed controlled purchases of crack cocaine from Deloch on September 6 and 14, 2005.  Police did not arrest Deloch at the time because the goal was to determine from where the supply came.

On September 7, 2005, police initiated an authorized wiretap on the cellular phone under the control of Deloch and intercepted approximately 255 pertinent (drug related) calls.  On September 30, 2005, police obtained an authorized wiretap of the cellular phone under the control of Darian James.  From September 30 to October 30, 2005, police intercepted 109 "drug pertinent" calls through the wiretaps on James' and Deloch's cellular phones.  Among those identified on the calls were Darian James, Sidney Deloch, James Nicholas, Sonya Seago, Christina Pace, Chuckie James, Tamiko James, Donald James, and Derrick James.  Police noticed the use of code words in intercepted conversations, such as references to amounts of cocaine by numbers associated with football players.

Fifty-five calls intercepted from the wiretap on James' phone were introduced at trial.  In one of the calls, Sonya Seago negotiated with James to sell her an ounce of crack cocaine for $750 instead of $800.  Darian had conversations with several of his codefendants, including James Nicholas, Chuckie James, Derrick James, Tamiko James, and Christine Pace, concerning quantities of drugs and money.  In one of the calls, James Nicholas and Darian James discussed monies that James owed Nicholas.

Police determined from information obtained in the investigation that the James family had two organizations, one including Deloch and his girlfriend, Rhonda Hunter, and the other including Darian James and his cousin, James Nicholas. Police received information from the confidential source that Deloch obtained kilograms of cocaine from John Young. Police determined that James Nicholas obtained cocaine from Lonnie Tinge and Cedric Lamb and supplied cocaine to Darian James, who distributed crack cocaine to Sonya Seago, Christine Pace, James Nicholas' brothers, Derrick and Tamiko James, and to Donald Ray James, an uncle of Deloch and Darian James.

At trial, Detective Peters testified that the common purpose of those involved was to acquire and cook powder cocaine, yielding crack cocaine that would be distributed to others for street sales. The drug proceeds were reinvested to purchase more cocaine. The detective testified that based on his knowledge, the activities of cooking and distributing cocaine were performed on a daily basis.

At trial, Deloch testified that he obtained powder cocaine in amounts of half a kilogram and a kilogram of cocaine from John Young, who charged him $24,000 for a kilogram. Deloch further testified that James Nicholas received cocaine from Cedric Lamb and Lonnie Tingle and that on one occasion, Deloch obtained cocaine from James Nicholas. Deloch cooked the cocaine at his house on Broad Street in Tampa, yielding more cocaine than supplied. From August through October 2005, Deloch distributed approximately ten kilograms of crack cocaine. Among those he distributed crack cocaine to were Allen Johnson (Deloch's cousin) and Myron Grooms (Deloch's brother-in-law).

Deloch also distributed an ounce of cocaine at a time to Geremi Pierce, who sold cocaine on Deloch's behalf. Deloch knew that Darian James was selling cocaine between August and November 2005. During this period, Deloch spoke with Darian James daily. Deloch would loan Darian James and other individuals money that came from drug sales.

At trial, the State introduced a compact disc containing recorded phone calls. The prosecution played for the jury five phone calls between Deloch and Darian James. In one of the intercepted calls, Darian James asked Deloch if he could call a third person about obtaining drugs, and in another call, Darian asked to borrow "fifteen bucks," meaning $1500. In a recorded call on September 8, 2005, Darian said that "Bone" (Tamiko James) said he was "thirsty" and "hollering" at Darian, meaning that Tamiko wanted some drugs. In a September 10, 2005, phone call with Larry James (Deloch's and Darian James' uncle), Deloch discussed an argument that he had with James Nicholas at Brookside Apartments. In the conversation, Deloch stated that Deloch paid for half of the furniture in Darian James' apartment, that Deloch had talked Darian James into letting James Nicholas have access to the apartment, that James stated there were too many people in and out of the apartment, and that James wanted everyone to stay out. In a September 11, 2005, phone call with Deloch, Darian asked to borrow $100 and discussed others who were selling drugs in the "country" (Thonotosassa) and who did not want the James family selling drugs there. In a September 25, 2005, phone call, Darian asked Deloch to help post bond for Christine Pace's daughter.

Deloch testified that from August to November 2005, he went to the Morro Manor apartment often and placed calls to individuals about drugs. Deloch would provide the individuals with crack cocaine that he obtained from the Broad Street house.

During redirect examination of Deloch, the State played for the jury a phone call in which Darian James spoke about not having money. In an October 26, 2005, phone call played for the jury, James asked Deloch to call someone to get drugs.

Christine Pace testified that during the latter part of 2005, she obtained crack cocaine from Darian James on numerous occasions. Pace called him several times a day and indirectly told him what she wanted. She purchased cocaine from him at the Brookside Apartments and other places, including her home. She testified that she would secure buyers of large amounts and sell them portions of the cocaine so that she could get high "for free." The State introduced a call between Pace and James in which she was trying to obtain cocaine. She explained that she owed James money for a packet of cocaine she had consumed and that she needed more product to sell so that she could pay him. She testified that the phone call was in October of 2005. After she was arrested in November of 2005, James sent her a card with a note that stated "Sincerely, Quick. Keep your head up and your trap tight. He's got you. Check your account." Subsequently, she received a deposit of $25 into her jail account.

Tamiko James testified that between August and November of 2005, he sold crack cocaine that James Nicholas and Darian James provided to him. Tamiko James testified that he saw Nicholas cook cocaine numerous times at Chuckie James' apartment. In

addition, Tamiko had seen Nicholas at Darian James' apartment. Tamiko observed a gun and cocaine in kitchen cabinets at that apartment. Before Tamiko pleaded guilty, he and Darian James listened to intercepted calls on a compact disc between Tamiko and Darian. At the time, they were not in custody. Tamiko testified that Darian told him to "take it to trial" and "we can't go against each other."

At trial, Tamiko identified Sonya Seago's voice on six phone calls in which Darian James discussed obtaining cocaine for Seago. between Seago and Darian James. In one of the phone calls, Darian James told Sonya Seago to go to Chuckie James' apartment for drugs. The State introduced nine phone calls between Tamiko and Darian. In the calls, Tamiko asked Darian for cocaine, and they discussed money he owed Darian for cocaine. The State also introduced five phone calls between Chuckie James and Darian James. At the time, Chuckie James was living at the Brookside Apartments. In the phone calls, they discussed cocaine and its quality. The phone conversations included references to "cookin[g] it," and "a little Vick."

The State also introduced two phone calls between Kevin Smith and Darian James. In one of the phone calls, Smith stated that he needed "something" and Darian told him to stop by the house.

Tamiko also identified others who discussed cocaine and monies owed. In one phone call with Darian James, Lonnie Tingle stated, "I'm gonna bring that back to ya." In a phone call between Derrick James and Jerome Fabian, there were discussions about needing "seven dollars" and "just fourteen."

The State introduced three calls between Darian James and Derrick James. In one phone call, Derrick asked for "a Brad" and a "softball". In a second call, they discussed cocaine, and in a third call discussed doing "some business" involving "just a little Vick." In a phone call between Donald James and Darian James, they discussed making "the stuff," money, and the Morro Manor apartment. In five phone calls between James Nicholas and Darian James, they discussed cocaine, money, and meeting.

**Standard of Review**

The AEDPA requires a prisoner who challenges "a matter 'adjudicated on the merits in State court' to show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). A habeas petitioner meets "this demanding standard only when he shows that the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (*per curiam*) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

**Ineffective Assistance of Counsel**

Darian James alleges that his trial and appellate counsel rendered ineffective assistance. To establish ineffective assistance of counsel, he must show that his Sixth Amendment right to counsel was violated because (1) his attorney's performance was

deficient, and (2) the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases.   *Id.* at 688. To establish *Strickland* prejudice, he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   *Id.* at 694.

Sustaining a claim of ineffective assistance of counsel on federal habeas review is difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and "when the two apply in tandem, review is 'doubly' so."   *Richter*, 562 U.S. at 105 (citations omitted).   "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."   *Id.*

### Discussion

### Procedurally Defaulted Grounds

### Grounds Four, Five, Six, and Eight

In Ground Four, James alleges that his trial attorneys failed to call Donald James, a codefendant, at trial.   According to Darian James, his codefendant would have testified both that Donald placed the cocaine in Darian's apartment and that Darian had no knowledge of its presence.   (Dkt. 1 at 10).   In Ground Five, James contends that attorney McKeever represented several codefendants in the same case during the same time and that his attorney created a dire situation for him in attempting to convince Donald James to testify against him.   (Dkt. 1 at 11).   James alleges that attorney McKeever should have

removed himself from representing James and that the state trial court should have appointed conflict-free counsel. Although James raised these grounds in his amended postconviction motion, his postconviction counsel announced that he was not going forward on these claims at the evidentiary hearing (Dkt. 20, Resp. Ex. F8 at 28–29), and James did not raise the claims on appeal of the order denying relief.

In Ground Six, James contends that his trial counsel rendered ineffective assistance by not moving to strike the verdict on the racketeering offense alleged in count one of the information. (Dkt. 1 at 13). He alleges that the jury instructions set out seven possible predicate offenses, of which the jury must find two offenses to convict him of racketeering. James argues both that none of the predicate acts alleged that he was part of a conspiracy and that there was no evidence of an agreement between James and another party to store the drugs located at James' apartment. (*Id.*). Although James raised this claim of ineffective counsel in his postconviction motion, he did not raise the summary denial (Resp. Ex. F at 16) of this claim on appeal.

In Ground Eight, James alleges that attorney McKeever failed to file a motion for judgment of acquittal on count four, conspiracy to traffic in cocaine. James contends that the State failed to make a prima facie showing that James conspired to traffic in 400 grams of cocaine. (Dkt. 1 at 16). James raised this claim of ineffective assistance of counsel in his amended postconviction motion, but did not raise the summary denial of the claim (Resp. Ex. F6 at 10–12) on appeal.

James has failed to satisfy the requirement that a petitioner exhaust his federal claims in state court before presenting them in his federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A). To properly exhaust these four claims, James was required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard*, 404 U.S. at 277–78. Because some of James' postconviction claims were denied after an evidentiary hearing, he was required to raise, in his appellate brief, all arguments he wished the appellate court to consider. *See* Fla. R. App. P. 9.141(b)(3)(C); *Cunningham v. State*, 131 So.3d 793 (Fla. 2d DCA 2012). Grounds Four through Six and Ground Eight are unexhausted because he did not raise them on appeal of the denial of postconviction relief.

A claim that was not presented to the state court and can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See Boerckel*, 526 U.S. at 839–40, 848; *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). State procedural rules do not provide for second collateral appeals. *See* Fla. R. Crim. P. 3.850(k) (stating that an appeal may be taken within 30 days of rendition of a final order denying postconviction relief). Because James cannot return to state court to file an untimely appeal or another postconviction motion, *see* Fla. R. Crim. P. 3.850(b), Grounds Four through Six and Ground Eight are procedurally defaulted.

A petitioner who fails to exhaust his claim is procedurally barred from pursuing that claim on habeas review in federal court unless he shows either cause for and actual prejudice from the default or a fundamental miscarriage of justice from applying the default." *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1353 (11th Cir. 2012). Cause must be something external to the petitioner, something that cannot fairly be attributed to him. If a petitioner fails to show cause, the court need not consider whether prejudice exists. *McCleskey v. Zant*, 499 U.S. 467, 502 (1991).

The miscarriage of justice exception requires the petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of new evidence. *Id.*

James has made none of the requisite showings to excuse his procedural defaults. This failure bars federal habeas review of the claims. *Coleman v. Thompson*, 501 U.S. 722, 7734–35 (1991). Grounds Four, Five, Six and Eight are procedurally defaulted and barred from review.

### Merits Review of Remaining Grounds

In Grounds One and Two, James alleges claims that he presented in a petition alleging ineffective assistance of appellate counsel. (Dkt. 20, Resp. Ex. C2). The state appellate court denied these claims without discussion. *James*, 61 So. 3d at 493. This Court presumes the state court's denial is an adjudication on the merits entitled to

deference under Section 2254. *See Wilson*, 834 F.3d at 1235. The petitioner bears the burden of showing that no reasonable basis exists for denying relief. *Id.*

**Ground One**

Darian James alleges that his appellate counsel rendered ineffective assistance by not raising, on appeal, the state trial court's denial of his motion for rehearing of the order denying his motion to suppress communications intercepted from the wiretaps ("wiretap motion."). (Dkt. 1 at 5). James alleges that he moved for rehearing based on new information that was developed after the denial of his wiretap motion. (*Id.*) James argues that at a September 7, 2007, deposition, Deloch testified that James had nothing to do with Deloch's telephone discussions of drugs or narcotics and that law enforcement misinterpreted language in calls that were used to establish probable cause for the wiretap of James' phone. (*Id.*) James further contends that he was neither linked to the controlled purchases from Deloch occurring in August and September 2005, nor named as a drug supplier for Deloch. (Dkt. 1 at 5–6).

After conducting a pretrial evidentiary hearing on May 18, 2007, the state trial court entered an order denying James' wiretap motion. (Dkt. 20, Resp. Ex. A4). In the order, the state trial court found that the wiretap application was sufficient, that probable cause existed, and that the exhaustion requirement had been met.[3] (*Id.* at 167). In a motion

---

[3] Before approving a wiretap, a judge must determine that normal investigative procedures have been tried and failed or reasonably appear unlikely to succeed or are too dangerous. § 934.09(3)(c), Florida Statutes (2005). The law enforcement agency need not show that it exhausted all other possible investigative techniques before seeking wiretap authorization; "[n]or must every other conceivable method of investigation

for rehearing of that denial, James alleged that a September 7, 2007, deposition, Deloch was asked whether any of the alleged pertinent phone calls involved discussion of drugs or narcotics, and he answered "no." (Dkt. 20, Resp. Ex. A5 at 182). James also alleged that Deloch clarified that police misinterpreted some of the language in the calls and that Deloch advised Detectives Peters and Stephenson of this information in a July 30, 2007, debriefing after Deloch entered a guilty plea. (*Id.* at 182–83). In addition, James alleged that Deloch would testify that James was not involved in any way with the controlled buys between Deloch and the confidential informant, and that the controlled buys were listed as probable cause for the wiretap on Deloch's phone. (*Id.*)

At the hearing on James' motion for rehearing, the prosecutor explained that the facts alleged in the rehearing motion came to light in July 2007 and did not affect the probable cause determination in 2005:

> [T]he facts that Mr. McKeever alleges in his motion for a rehearing are all facts and information that came about subsequent to the probable cause finding.
>
> The probable cause finding by Judge Black that authorized the wire intercept occurred on September 6, 2005. In the State's original argument back in May of this year it was the State's position, and it continues to be my position, that this Court, in determining whether there was probable cause for the wire intercept, should look only at the facts known to law enforcement and to Judge Black on September 6th of 2005. And the Court had agreed with the State and allowed the testimony into evidence back in May as to the facts that were known to law enforcement at that time, which did not only include controlled phone calls between a cooperating source and Mr. Deloch but

---

be unsuccessfully attempted before electronic surveillance will be authorized." *United States v. Johnson*, 281 F. App'x 909, 912 (11th Cir. 2008) citing *Shaktman v. State*, 529 So. 2d 711, 722 (Fla. 3d DCA1988).

information from three separate confidential informants who did implicate Darian James in the sale of crack cocaine.

So, I don't dispute that the facts that Mr. McKeever has put in his motion, those are facts that have come out in July of this year. But those did not affect the probable cause determination back in 2005 and that's what Your Honor reviewed. So, I would ask Your Honor not to change your decision.

(Dkt. 20, Resp. Ex. A 13 at 423--24).

James' trial counsel did not dispute the prosecutor's representation that the facts alleged in the rehearing motion came out after the probable cause determination in 2005, and the trial court denied the motion for rehearing. On direct appeal, James' appellate counsel argued that law enforcement failed to comply with state statutory requirements for obtaining a wiretap, thereby violating his constitutional right to privacy. (Dkt. 20, Resp. Ex. B1).

In his memorandum in support of the instant petition, James contends that the telephone calls were used to establish probable cause in obtaining the wiretap of James' phone. He cites his trial counsel's argument that Deloch's subsequent information was essential in determining whether law enforcement had met the statutory requirements prior to tapping James' phone. (Dk. 2 at 7).

"Probable cause for a wiretap is the same probable cause required for a search warrant." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir.1990) (citation omitted). Probable cause is based upon whether "given all the circumstances set forth in the affidavit. . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The court need merely

16

determine whether the judge who signed the warrant had a substantial basis for concluding that probable cause existed.   *Nixon*, 918 F.2d at 900 (citing *Illinois v. Gates*, 462 U.S. at 238-39).   James' rehearing motion did not present facts that would show the state trial court lacked a substantial basis for finding probable cause.   Accordingly, James cannot show his appellate counsel performed deficiently by not arguing that the state trial court erred by not granting rehearing of the order denying the wiretap motion.

James has not shown *Strickland* prejudice.   His appellate counsel presented argument based on James' allegations in the motion for rehearing.   Specifically, appellate counsel argued that the motion for rehearing "pointed out new evidence that Deloch would testify the Defendant was not involved in any narcotics phone calls or transactions."   (Dkt. 20, Resp. Ex. B1 at 38).   In addition, appellate counsel argued that because law enforcement failed to demonstrate the confidential source's reliability to support probable cause, "especially in light of the new testimony by Deloch," law enforcement did not strictly comply with the dictates of the statute," rendering the application insufficient and the wiretap authorization illegal.   (*Id.* at 39).

Further, James failed to demonstrate that he was entitled under state law to rehearing of the ruling on the wiretap motion based on Deloch's subsequent testimony. Although James' ineffective assistance of counsel claim is a federal constitutional claim, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . [a federal court] must defer to the state's construction of its own law."   *Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) (quoting *Alvord v.*

*Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)). Given also that his appellate counsel advanced arguments raised in the rehearing motion, James fails to demonstrate a reasonable probability that he would have prevailed on appeal had his appellate counsel argued that the state trial court erred in denying the motion for rehearing of the ruling on the wiretap motion.

The state appellate court's denial of this ground was not contrary to or an unreasonable application of *Strickland*, and the denial is not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Darian is not entitled to relief on Ground One.

### Ground Two

James contends that his appellate counsel rendered ineffective assistance by not arguing that the verdict form was defective. (Dkt. 1 at 7). He contends that count four of the charging document, conspiracy to traffic in cocaine, defined trafficking as "to manufacture or deliver or be in actual or constructive possession of 400 grams or more but less than 150 kilograms of cocaine or any mixture containing cocaine. (*Id.*). James contends that although the jury was instructed on the offense of conspiracy to traffic in cocaine, the verdict form did not give the jury the option of finding him guilty of the lesser offense of conspiracy "to deliver" cocaine. (*Id.*).

Instruction on conspiracy to deliver cocaine is not automatically required as a lesser included offense of conspiracy to traffic in cocaine. *State v. Weller*, 590 So. 2d 923, 926 (Fla. 1991). In James' case, his trial counsel did not request an instruction on conspiracy

to deliver cocaine as a permissible lesser offense of the conspiracy offense alleged in count four of the charging document. For that reason, appellate counsel did not perform deficiently by not raising the issue.

James has also failed to demonstrate prejudice. A habeas petitioner cannot show prejudice from an appellate counsel's failure to raise an issue that would not have been decided because it was not preserved in the trial court. *Pinkney v. Sec'y, Dep't of Corr.*, 876 F.3d 1290, 1298 (11th Cir. 2017). Further, the jury had the option of exercising its pardon power by finding James not guilty of conspiracy to traffic in cocaine. (Dkt. 20, Resp. Ex. A10). Accordingly, he fails to show a reasonable probability that he would have prevailed on appeal had his appellate counsel argued that the verdict form was defective.

The state appellate court's denial of this ground was neither an unreasonable application of *Strickland*, nor based on an unreasonable determination of the facts. James is not entitled to relief on Ground Two.

Grounds Three and Seven allege claims of ineffective assistance of trial counsel that James raised in his amended postconviction motion and on postconviction appeal.

### Ground Three

Darian James alleges that his trial counsel failed to conduct any meaningful investigation and to call witnesses at trial. Specifically, he contends his attorneys failed to call Marian Rivera, Chuckie James, and James Nicholas, whom Darian James characterizes as exculpatory witnesses. He argues that these witnesses knew Tamiko James from childhood and knew "his character to be untruthful." (Dkt. 1 at 8).

Contending that Tamiko James testified to the substance of coded calls that were obtained through a wiretap, Darian James argues that Rivera, Chuckie James, and James Nicholas would have testified to Tamiko's "untruthfulness," thereby calling into doubt his testimony. (*Id.*)

Darian also alleges that he provided his counsel the names of other witnesses and co-defendants who would have testified that Darian "was not talking about drugs." (Dkt. 1 at 9). He contends that Derrick James, Sonya Seago, and Chuckie James signed affidavits "attesting to these facts." (*Id.*)

After conducting an evidentiary hearing, the postconviction court made these findings in denying relief on the failure-to-investigate component of this ground:

> At the evidentiary hearing Defendant testified on his own behalf. Defendant claimed that he had provided a list of witnesses to Dalton McKeever, his trial counsel, and that Defendant and Mr. McKeever had discussed the witnesses "about every time [he] had a chance to talk to him about the case." Defendant testified that the list included Marian Rivera, Derrick James, Chuckie James, Sonya Seago, and James Nicholas. He stated that all the listed witnesses were codefendants except for Marian Rivera. Defendant then alleged that Mr. McKeever told Defendant he could not call the witnesses on the list because they were codefendants. Defendant additionally alleged that, to his knowledge, Mr. McKeever never spoke to any of the witnesses or had an investigator or someone else from the office speak to the witnesses.

> Defendant further stated that Tamiko James, Defendant's cousin, testified at his trial and that Tamiko James's testimony interpreting wiretapped conversations, along with the wiretapped conversations, was a large portion of the case against Defendant. Defendant then testified that Tamiko James is "a known liar" in their community. Because of Tamiko James's untruthful reputation, Defendant alleged, Defendant wanted the witnesses called to testify regarding that reputation.

> On cross-examination, Defendant conceded that Tamiko James, Chuckie James, Derrick James, and James Nicholas were all his codefendants as

20

well as his relatives. When asked whether he had told Mr. McKeever that he did speak about drugs in coded language with Tamiko James, Derrick James, Chuckie James, or Christina Pace, Defendant responded that he had not. Defendant also testified that he did not tell Mr. McKeever that he had supplied drugs to Sonya Seago. Defendant also admitted to having five previous felony convictions.

On re-direct examination, Defendant clarified that Tamiko James had an untruthful reputation among family, friends, and "[j]ust general people on the streets."

Tonya Yvette James Rhodes, Defendant's sister, then testified on Defendant's behalf. Ms. James Rhodes testified that she provided names of witnesses to Mr. McKeever, including Marian Rivera, Derrick James, Chuckie James, Sonya Seago, and James Nicholas. Additionally, Ms. James Rhodes testified that, before trial, she spoke with Mr. McKeever or his secretary between five to eight times.

Debra James, Defendant's mother, then testified on Defendant's behalf. Debra James testified that she told Mr. McKeever that her sisters, Marian Rivera and Kathy James, and brother-in-law, as well as a few others, were willing to testify on Defendant's behalf. Additionally, Debra James testified that she told Mr. McKeever during trial that Tamiko James had lied at trial and that she wanted Mr. McKeever "to recall Tamiko as well as recall Sidney." Debra James also testified that Mr. McKeever did not call or recall Tamiko James as a witness. On cross-examination, Debra James clarified that the witnesses she wanted Mr. McKeever to investigate were Kathy James and Willy Waedy. Additionally, she clarified that Tamiko James and Sidney Deloch had testified on behalf of the State. Then, on re-direct examination, Debra James clarified that she also gave Mr. McKeever Marian Rivera's name.

Marian Yvonne Rivera, Defendant's aunt and the mother of Tamiko James, testified on Defendant's behalf. Ms. Rivera first testified that she is aware of Tamiko James's reputation for truthfulness in her family and the community in general. When asked what Tamiko James's reputation is, Ms. Rivera testified that he is a liar. Ms. Rivera additionally stated that she would have testified at trial that Tamiko James's [sic] had a reputation for being untruthful. On cross-examination, Ms. Rivera conceded that she was living in Gibsonton, Florida and Tamiko James was living in North Tampa, Florida at the time of Defendant's trial in November 2007. Ms. Rivera also conceded

that Tamiko James was not living with her from July to September of 2005 and that she did not know where he was living.

James Nicholas, Defendant's cousin and Tamiko James's brother, also testified on behalf of Defendant. Mr. Nicholas testified that he is aware of Tamiko James's reputation for truthfulness among the family and that he had a reputation for being untruthful. Mr. Nicholas also testified that his case was resolved prior to Defendant's trial and that there was nothing, to his knowledge, preventing him from testifying at Defendant's trial. (*See* EH Transcript, p. 37, attached). Mr. Nicholas stated that if given the opportunity to testify at trial, he would have testified about Tamiko James's reputation for truthfulness. On cross-examination, Mr. Nicholas conceded that at the time he and Defendant were arrested, he was living in Wesley Chapel, which is not in Hillsborough County, and Defendant was living in Hillsborough County.

Derrick James, Defendant's cousin and Tamiko James's brother, testified on behalf of Defendant. Derrick James first stated that he was a codefendant in the case at hand and that his case resolved prior to Defendant's trial. He also testified that he was aware of some phone conversations alleged to have been between him and Defendant and that he had a chance to review the transcripts.

Derrick James then testified that at no point in his phone discussion were he or Defendant discussing the purchase or sale of cocaine and that he would have testified at trial that they were talking about "football basically and stuff." Derrick James also stated on the record that he waived his right to attorney-client privilege with Mr. McKeever and identified his own signature on the waiver.

On cross-examination, Derrick James admitted that it had been seven years since he listened to the taped phone calls. Additionally, he admitted that he could not read or write, and had never personally read the affidavit he signed. Derrick James also admitted to having more than four prior felony convictions. When questioned regarding his phone conversations with Defendant, Derrick James testified as follows:

> Q.  Okay. Now you testified that you never spoke about drugs with Darian James on the phone, is that correct?
>
> A.  Exactly.

22

Q. Okay. When the phone calls are being intercepted you weren't aware law enforcement was listing to you, were you?

A. How would I know that?

Q: Now, what is booger sugar?

A. Booger sugar? I have no idea what booger sugar is.

Q. Well, if you used that term to Darian on the phone, what were you talking about?

A. It, it could be a lot of things. It a lot of terms on the phone. I don't know.

Q: You don't know?

A. I have no idea.

Q. Okay. What about telling Darian James that someone wants a Michael Vick?

A. We talking about a gambling bet.

Q. So what kind of bet is a Michael Vick?

A. It's a bet, a gambling bet. We talking about gambling. I'm a compulsive gambler.

Q. Well explain that to me. If you said, I want a Michael Vick in terms of gambling, what does that mean?

A. You talking about a gambling bet, point blank. Next question.

Q. What about a softball, does that refer to an amount of cocaine?
A. No

Q. Are you gambling on softball?

A. Darian is on a softball team and a football team. He a captain.

Q: So when you ask Darian if he has any C, what does that mean?

A. C? I have no idea. I can't recall none of that you talking about. I don't know what you talking about.

Chuckie Darnell James then testified on Defendant's behalf. Chuckie James testified that he is the cousin of Defendant and Tamiko James. He then testified that he was aware of Tamiko James's reputation for truthfulness in the family and that Tamiko James['] reputation was that "[h]e just always lying." Chuckie Darnell stated that had he been called to testify, he would have testified to Tamiko James's reputation as a liar. He additionally testified that he was a codefendant in the case, that his case was resolved before Defendant's case, and that he was not aware of anything preventing him from testifying at Defendant's trial. Chuckie James also testified that he reviewed the wiretap conversations and that at no point during the conversations were he and Defendant discussing the purchase or sale of cocaine. He then stated that he would have testified to the same facts at trial.

On cross examination, when asked what he and Defendant were talking about in their phone calls, Chuckie James testified as follows:

A. Um, we were into selling tennis shoes. It could have been Jordans, DVDs, it could have been a bunch of anything.

Q. So it could have been anything except for selling cocaine, is that what you're testifying to?

A. Yes, ma'am.

Q. So you can't say exactly what the calls were about, am I understanding correctly?

A. The calls were about Michael Vicks, which is a football player and it's also a term used for the number Seven Jordans, Michael Jordans bootleg $125 a piece [sic.], $110 a piece [sic], you know.

Q.   Okay. So when you are on a phone call with Darian and you tell him that you still owe him $200 for the Vick that you got out of the apartment, what you're telling me is that that's about a pair of shoes that's [sic] a 150-dollar shoes, not about a quarter ounce of cocaine?

A.   Yes, ma'am.

Q.   Okay. And how about pancakes, what are pancakes? Are those amounts of cocaine?

A.   No, ma'am.

Q.   Okay. Are you talking about breakfast foods?

A.   Yes, ma'am.

Q.   Okay. And were you selling breakfast out of the apartments back then?

A.    No, ma'am.

Q.   Was Darian?

A.   I like to cook.

Q.   Okay. Now how about thunder?

A.   Marijuana.

Chuckie James additionally testified that he pled guilty to trafficking in cocaine and being a felon in possession of a firearm.

Sonya Seago also testified on Defendant's behalf. Ms. Seago testified that she and Defendant have been friends for many years and are basically like family members. Ms. Seago testified that she did not at any point in her conversations with Defendant discuss the purchase or sale of cocaine. Ms. Seago could not specifically recall what she and Defendant discussed in each conversation

On cross-examination, Ms. Seago conceded that she pleaded guilty to possession of cocaine with intent to sell or deliver and that she had cocaine in her possession when she was arrested. She additionally admitted that she

had three prior felonies on her record: Additionally, Ms. Seago testified that she and Defendant did not speak in code regarding the sale of cocaine.

The State then called Dalton McKeever, Defendant's trial counsel, to testify regarding Defendant's claims. Mr. McKeever testified that neither Defendant nor any members of his family had asked Mr. McKeever to call any witnesses on Defendant's behalf, which included witnesses Marian Rivera, Chuckie James, James Nic[h]olas, Derrick James, or Sonya Seago. Mr. McKeever additionally testified that he did not have any written list of witnesses from Defendant in his entire case file. Mr. McKeever also testified that had Defendant or his family told him any names of witnesses, he would have investigated them.

Mr. McKeever next testified that he reviewed the content of the intercepted phone calls with Defendant and that Defendant indicated Tamiko, Chuckie, Sonya Seago, and Christine Pace contacted Defendant about drugs in an encoded manner. Mr. McKeever additionally testified that Defendant never told him that the conversations had been misinterpreted or that they were only regarding football. Mr. McKeever testified that Defendant admitted that some of the phone calls could be damaging to him because he had sold drugs to Christina Pace and she had worked for him selling drugs on some occasions. Mr. McKeever stated that Defendant had told him that sometimes he loaned his phone to Derrick James and that he was unsure what Derrick James discussed in the phone calls. Mr. McKeever also testified that Defendant did not specifically ask him to call any of Defendant's codefendants as witnesses and that if he had been asked to investigate the codefendants as witnesses, he would have.

On cross-examination, Mr. McKeever conceded that if Derrick James had been called as a witness on behalf of Defendant, he probably would have testified that they were not talking about drugs on the phone. However, Mr. McKeever also noted that Derrick James would have placed Defendant inside the apartments where the drugs were being produced. Mr. McKeever additionally testified that his strategy was to question the credibility of witnesses Tamiko James, Christina Pace, and Sidney Deloch.

After reviewing Defendant's allegations; the testimony, evidence, and arguments presented at the March 7, 2014 evidentiary hearing; the court file; and the record; the Court finds, to the extent necessary, the testimony of Mr. McKeever to be credible than that of Defendant and his additional defense witnesses. Consequently, the Court finds that Mr. McKeever investigated the phone calls between Defendant and his codefendants and determined from

Defendant's statements that the phone conversations did relate to the sale of drugs. Moreover, Defendant never suggested to Mr. McKeever that the encoded conversations related to football rather than the sale of drugs. Finally, in light of the information he gathered, Mr. McKeever opted to pursue a strategy in which he questioned the credibility of witnesses Tamiko James, Christina Pace, and Sidney Deloch.

After reviewing Defendant's claim, the testimony and arguments presented at the evidentiary hearing, the court file, and the record, the Court finds that Defendant has failed to meet his burden to demonstrate that counsel's performance was deficient. In demonstrating deficiency, defendants bear the burden to "overcome the presumption that, under the circumstances, the challenged action 'might' be considered sound trial strategy." *See Strickland*, 466 U.S. at 690 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (] 955)); *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000) (holding that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct"). Here, the Court finds that Mr. McKeever reasonably investigated the facts surrounding Defendant's case and adopted a reasonable trial strategy, which involved impeaching the credibility of the witnesses against Defendant rather than calling witnesses to rebut the testimony. Thus, because Defendant has failed to demonstrate deficiency in counsel's performance and that such deficiency led to prejudice, Claim (1)(a) must be denied. *See Strickland*, 466 U.S. at 686-687.

(Dkt. 20, Resp. Ex. F7 at 12–15) (record citations and footnote omitted). Addressing James' claim that counsel failed to call witnesses at trial, the postconviction court also credited counsel's testimony in finding that James failed to demonstrate that his counsel's performance was deficient and that such deficiency prejudiced him. (Resp. Ex. 20, Resp. Ex. F9 at 18–19).

In his memorandum in support of the instant petition, James argues that his attorneys did not adequately investigate his case by interviewing or deposing several "exculpatory" witnesses whom he "identified and requested that they contact." (Dkt. 2 at

11).   His trial counsel's accredited testimony was that neither Darian James nor his family provided counsel with the names of witnesses to investigate.   The state court's determination that counsel's testimony was more credible than the testimony of James and his witnesses is a finding of fact that is presumed to be correct.   James has not rebutted this presumption by clear and convincing evidence.   *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct unless [the petitioner] rebuts the presumption by clear and convincing evidence." (citing 28 U.S.C. § 2254(e)(1)).

In addition, James has not shown that the state postconviction court unreasonably applied *Strickland* in finding that counsel made a reasonable strategic decision to question the State's witnesses, rather than to call witnesses at trial. *See Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (a tactical decision amounts to ineffective assistance "only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)).   In light of counsel's testimony that James told counsel that phone conversations did relate to the sale of drugs, James fails to show that no competent attorney would have employed the chosen strategy.

James also failed to show prejudice.   In view of the state postconviction court's finding that counsel's testimony was more credible than the testimony of James and his witnesses, James failed to establish that there was any reasonable probability that the

outcome of the trial would have been different had counsel pursued and called James'
associates or family members at trial.

The state court's ruling constitutes a reasonable application of *Strickland* and is
based on a reasonable determination of the facts.   James is not entitled to relief on
Ground Three.

**Ground Seven**

James alleges that trial counsel induced him to sign a stipulation.   At trial, the
parties stipulated to the items recovered at the Morro Manor apartment. (Dkt. 20, Resp.
Ex. A15 at 537--538, 586). According to James, his counsel explained that the stipulation
only addressed the location of the cocaine.   He contends that the stipulation also dealt
with the weight of the substance and the positive result that the substance was cocaine.
(Dkt. 1 at 14).   After conducting an evidentiary hearing, the postconviction court denied
this ground:

> At the evidentiary hearing Defendant testified that Mr. McKeever presented
> him with a stipulation. When asked what Mr. McKeever told him was in the
> stipulation, Defendant testified as follows:
>
>> A.  What was told to me that he didn't want the FDLE to just
>> come in and say that it was drugs or whatever the case may
>> be, but that was all we talked about at the time. He told me it
>> would help my case.
>>
>> Q.  Did he explain to you that you were agreeing to the
>> substance being cocaine and the amount of drugs?
>>
>> A.  No, ma'am. Just the fact that we didn't want the FDLE to
>> take the stand since we already — it didn't matter what the
>> drugs were or not — really or not. He just didn't want the·FDLE
>> to take the stand. We were going from there.

29

The State called Dalton McKeever to testify regarding the stipulation. Mr. McKeever testified that he had a conversation with Defendant regarding whether or not they would stipulate to the FDLE results. Specifically, Mr. McKeever referenced his notes, which stated, "(T]alked to defendant about stipulating to the FDLE reports. Defendant does not object because issue is not of amount of drugs, it is constructive possession." Mr. McKeever also testified that he did not say that the stipulation was only as to the location of the drugs and that he specifically discussed with Defendant what he was stipulating to. Mr. McKeever then explained that he discussed with Defendant how signing the stipulation fit into his trial strategy, which was based on the theory that Defendant rented the apartments but did not have knowledge of what was going on inside them or of the location of the drugs. He also explained that the strategy did not involve challenging whether the substance was cocaine or what amount of cocaine existed.

After reviewing Defendant's allegations; the testimony, evidence, and arguments presented at the March 7, 2014 evidentiary hearing; the court file; and the record; the Court finds the testimony of Mr. McKeever to be more credible than that of Defendant. Accordingly, the Court finds that Mr. McKeever fully discussed the stipulation with Defendant and explained how the stipulation fit into his trial strategy, which was not based on challenging the nature or amount of the substance found at the scene.

Thus, the Court finds that Defendant has failed to meet his burden to show that Mr. McKeever's performance was deficient because Mr. McKeever did explain to Defendant the contents of the stipulation. Moreover, the Defendant failed to meet his burden to "overcome the presumption that, under the circumstances, the challenged action 'might' be considered sound trial strategy." . . . The Court finds that Mr. McKeever exercised sound trial strategy in advising Defendant of the contents of the stipulation and how it fit into his theory of the case. Thus, Defendant has failed to demonstrate that counsel's performance was deficient, and that the outcome of his trial was prejudiced. Consequently, no relief is warranted on Defendant's Claim (5).

(Dkt. 20, Resp. Ex. F7 at 20–22) (citations omitted).

James has not rebutted the presumption of correctness of the state court's credibility determinations by clear and convincing evidence. Counsel's accredited testimony shows that counsel did not advise James that the stipulation addressed only the

location of the drugs.   Rather, counsel explained to James the matters of which he was stipulating and how the stipulation served the defense that James rented the apartments but had no knowledge of what occurred therein, or of the location of drugs.   Based on counsel's testimony and the defense theory presented at trial, a fairminded jurist could agree with the state court's determination that James failed to establish both deficient performance and prejudice under *Strickland*.   Because James failed to show his counsel gave any misleading advice about the stipulation, he cannot show his counsel performed deficiently to James' prejudice.

The state court's rejection of this ground does not involve an unreasonable application of the *Strickland* standard. and the decision is not based on an unreasonable determination of the facts.   James is not entitled to relief on Ground Seven.

### Ground Nine

James alleges that the state trial court erred in denying his motion to suppress communications from an "illegally obtained" wiretap. (Dkt. 1 at 17).   James alleges that the State failed to comply with state statutory requirements of Chapter 934, Florida Statutes, thereby violating his constitutional right to privacy. (Dkt. 1 at 17–18). Specifically, James argues that law enforcement did not pursue normal investigative techniques that were available.   He also argues that probable cause was based on information from unreliable and unproven informants, the criminal history of eight defendants, a controlled buy with an informant on August 22, 2005, and surveillance that yielded no illegal activity.   (Dkt. 1 at 19).

The Florida legislature substantially revised chapter 934 in 1988 to conform with the federal provisions regarding the interception of wire, oral, or electronic communications. *State v. Jackson*, 650 So. 2d 24, 27 (Fla. 1995). As amended in 1988, the statute allows the interception of wire, oral, or electronic communications only when a law enforcement agency follows the wiretap procedures in section 934.09. *Jackson*, 650 So. 2d at 27. An order authorizing the interception of wire, oral, or electronic communication requires a judicial finding of probable cause for the belief that an individual is committing, has committed, or is about to commit an offense listed in section 934.07, probable cause for belief that communications about the offense will be obtained through the interception, and a determination that normal investigative procedures have failed, or reasonably appear to be unlikely to succeed if tried or to be too dangerous. *Id.*

At the hearing on James' wiretap motion, the state trial court found that the issuing judge's authorization order was not arbitrarily entered, there was sufficient probable case, and statutory requirements were met. (Dkt. 20, Resp. Ex. A12 at 410). In the written order denying the wiretap motion, the court held that the wiretap application was sufficient, probable cause existed, and the exhaustion requirement was met. (Dkt. 20, Resp. Ex. A4). To the extent that James challenges the trial court's ruling that state statutory requirements were met or he challenges the wiretap authorizations as violative of his state right to privacy, he raises issues of state law for which federal habeas relief does not lie. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of federal habeas court to re-examine state court determinations on state-law questions.).

To the extent that he argues a violation of his federal constitutional right to privacy, he shows no entitlement to relief. James alleges that Florida's Security of Communications Act is a statutory exception to state and federal constitutional rights of privacy and must be strictly construed. (Dkt. 1 at 18). *See Jackson*, 650 So. 2d at 26 (stating that wiretap statutes are exceptions to the federal and state constitutional rights to privacy) (citation omitted). Deference must be afforded the state trial court's determination that law enforcement satisfied Florida's statutory requirements for interception of communications on Deloch and James' phones. *See United States v. Johnson*, 281 F. App'x 909, 912 (11th Cir. 2008) (stating that federal courts must defer to state law on the question of the validity of wiretap orders obtained by state law enforcement officers). Because his federal constitutional claim is premised on his claim that the State did not comply with the dictates of the state's statute and the state trial court determined that state statutory requirements were met, James cannot establish that his federal constitutional right to privacy was violated.

The state court's decision is neither contrary to nor an unreasonable application of federal law as clearly established by the Supreme Court and is not based on an unreasonable determination of the facts. James is not entitled to relief on Ground Nine.

**Ground Ten**

James alleges that the trial court abused its discretion in denying his motion to sever count ten, trafficking in cocaine, and count eleven, felon in possession of a firearm. (Dkt. 1 at 20). James alleges that both charges resulted from the execution of the search

warrant at his apartment on November 3, 2005, and that the charges constitute separate episodes connected only by similar circumstances and were not relevant to the charges alleging a violation of the "Florida RICO (Racketeering Influenced and Corrupt Organization) Act." Section 895.01, Florida Statutes. James alternatively argues that any relevancy was outweighed by unfair prejudice to him "as the only connection was the Defendant's alleged guilt" of both offenses. (*Id.*)

Although James raised his issue of improper joinder of offenses on direct appeal, he raised the issue in state law terms. (Dkt. 20, Resp. Ex. B1). The Court need not address the exhaustion issue because the Respondent does not advance an argument that the ground is unexhausted. Even if the ground is unexhausted, the claim warrants no relief. *See* 28 U.S.C. § 2254(b)(2) ("an application for habeas corpus may be denied on the merits, notwithstanding a petitioner's failure to exhaust in state court.").

Under Fla. R. Crim. P. 3.150, two or more offenses which are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on two or more connected acts or transactions. *Id.* This permits the joinder of offenses that are causally related because they "stem from the same underlying dispute and involve the same parties." *Spencer v. State*, 645 So. 2d 377, 382 (Fla. 1994). Whether to grant a requested severance is within the trial court's discretion. *State v. Vazquez*, 419 So. 2d 1088, 1090 (Fla. 1982). To the extent that James contends that the state trial court abused its discretion under Florida law in denying his motion for

34

severance of offenses, the claim is not cognizable on federal habeas review because it involves only an alleged error in state law. The habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (*per curiam*) (quoting 28 U.S.C. § 2254(a)). "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

To the extent this ground could be construed to present a claim that the trial court's refusal to sever the two counts from the remaining claims violated James' Fifth Amendment right to a fair trial, such claim also fails. In *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id.* *Lane* dealt with the joinder under Federal Rules of Criminal Procedure 8 and 52. No constitutional issue was before the Court. Even assuming, however, that the standard mentioned in the footnote in *Lane* governs this issue, James shows no violation of his constitutional right to a fair trial.

The state court granted his motion for severance of offenses, in part, by severing the felon portion of the charge alleging that he was a felon in possession of a firearm. Further, counts ten and eleven arose from the same occurrence, the execution of the search warrant, and evidence that a trafficking amount of cocaine and the firearm were

found in the apartment was within the time alleged in the rackeeting and conspiracy offense alleged in counts one and four. In addition, the evidence was admissible and relevant to these charges. Accordingly, joinder of the offenses would not cause undue prejudice such as to deprive James of his federal constitutional right to a fair trial.

James is not entitled to relief on Ground Ten.

**Ground Eleven**

James alleges that the state trial court erred in admitting into evidence a compact disk containing 61 recorded phone calls. (Dkt. 1 at 20). He contends that the prosecutor played eight of the phone calls on the CD for the jury and that seven phone calls were between Deloch and James, and one call was between Deloch and James. (Dkt. 1 at 20). James alleges that during Christine Pace's testimony, the State introduced another CD containing a recorded phone call between James and Pace. (*Id.*) In addition, he alleges that during Tamiko James' testimony, the State introduced nine recorded phone calls on the CD between Tamiko and Darian, 25 calls between Darian and other identified parties to the conversations, 17 calls between Darian and unidentified parties, and one call between Derrick James and Jerome Fabian that did not involve Darian. (*Id.*) According to James, the State did not properly authenticate any of the recordings prior to their introduction. (Dkt. 1 at 20). He also argues that two of the phone calls constituted inadmissible hearsay.

Further, James argues that 42 of the calls violated the Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968). (Dkt. 1 at 20-21). He argues the persons

whom Tamiko James identified as speaking with Darian did not testify at trial or were subject to cross-examination.   He also contends that none of the unidentified speakers were subject to cross-examination.   (Dkt. 1 at 22).

To the extent that James alleges the recorded conversations were inadmissible hearsay or did not qualify under the co-conspirator hearsay exception under state law, these claims are not cognizable on federal habeas review.   Likewise, his arguments that the State did not lay a proper predicate to authenticate the recordings are not cognizable. *See Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."); *Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.").

As to his claims that the trial court's admission of the recordings violated his constitutional right to confrontation under *Crawford v. Washington* and *Bruton v. United States*, 391 U.S. 123 (1968), James fails to show entitlement to relief.   In *Bruton*, the Supreme Court held that a criminal defendant is deprived of his right of confrontation when a non-testifying codefendant's facially incriminating confession, naming the defendant as a participant, is introduced at their joint trial.   *Bruton*, 391 U.S. at 131. (1987).   *See also Greene v. Fisher*, 565 U.S. 34, 36 (2011) (noting that *Bruton* establishes that "the Confrontation Clause forbids the prosecution to introduce a nontestifying codefendant's confession implicating the defendant in the crime").   After *Bruton,* the Supreme Court held in *Crawford v. Washington* that the Confrontation Clause permits "[t]estimonial statements

of witnesses absent from trial. . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36 at 52. Testimonial statements include those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. *See also Davis v. Washington*, 547 U.S. 813, 822 (2006) (statements are testimonial when "circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.").

As *Crawford* recognized, "statements in furtherance of a conspiracy" are an example of nontestimonial statements that fall outside the protection of the Confrontation Clause. *See Crawford*, 541 U.S. 36 at 56 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial — for example, business records or statements in furtherance of a conspiracy."). In James' case, the statements of his co-defendants in phone calls introduced at trial were in furtherance of the conspiracy to traffic in cocaine and were not made under circumstances that would have led the codefendants reasonably to believe that their statements would be available for use at a later trial. *See, e.g.*, *United States v. Makarenkov*, 401 F. App'x. 442, 444 (11th Cir. 2010) ("[T]he statements made by [a co-conspirator] to the confidential informant were not testimonial because the statements were not made under circumstances in which he would expect his statements to be used in court — he believed he was speaking to a trusted accomplice in crime. Therefore, the admission of [the co-conspirator's] statements did not violate

38

Makarenkov's rights under the Confrontation Clause."). *See also United States v. Underwood*, 446 F.3d 1340, 1347 (11th Cir. 2006) (recorded statements of co-conspirator to informant made "in furtherance of the criminal conspiracy . . . clearly were not made under circumstances which would have led him reasonably to believe that his statement would be available for use at a later trial").  Because the nontestifying co-defendants' statements in the recorded phone calls were not testimonial, the introduction of the recorded statements did not implicate the *Bruton* rule.  In *United States v. Rodriguez*, 591 F. App'x 897, 902 (11th Cir. 2015), the Eleventh Circuit stated:

> We have not yet addressed, in a published case, whether an out-of-court statement must be testimonial for *Bruton* to apply. However, we conclude that, as *Bruton* was premised on the Confrontation Clause, its protections only apply to testimonial statements. Every other Circuit to have considered the issues has concluded the same. *See, e.g., United States v. Berrios*, 676 F.3d 118, 128–29 (3d Cir. 2012); *United States v. Castro–Davis*, 612 F.3d 53, 65–66 (1st Cir. 2010); *United States v. Smalls*, 605 F.3d 765, 768 n. 2 (10th Cir. 2010); *United States v. Johnson*, 581 F.3d 320, 325–26 (6th Cir. 2009); *United States v. Avila Vargas*, 570 F.3d 1004, 1008–09 (8th Cir. 2009). Accordingly, here, there was no *Bruton* error.

*Id.* at 902.  James has not shown that *Bruton* applies to non-testimonial statements of his codefendants in phone conversations introduced at trial.  Additionally, James had the opportunity to cross-examine the testifying codefendants, and he establishes neither a *Bruton* error or a *Crawford* violation in the trial court's allowance of their statements in the phone calls.  And he shows no federal confrontation violation based on his claim that he was deprived of an opportunity to confront unidentified speakers on intercepted phone calls. Because the statements by unidentified co-conspirators were non-testimonial, the

introduction of their statements in recorded calls did not violate the Confrontation Clause. See *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (Under *Crawford*, the Confrontation Clause has no application to an out-of-court nontestimonial statement not subject to prior cross-examination.).

James cites *Pointer v. Texas*, 380 U.S. 400 (1965), stating that to deprive a defendant of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process. *Id.* at 405. To the extent that he alleges he was denied his federal right to due process because he had no opportunity to cross-examine non-testifying co-defendants and other declarants about the phone calls, the due process claim fails, as no Sixth Amendment confrontation violation occurred in admission of the recorded calls, as explained, *supra.*

The state court's ruling is not contrary to or an unreasonable application of clearly established federal law and is not based on an unreasonable factual determination. He is not entitled to relief on Ground Eleven.

### Grounds Twelve, Thirteen, and Fourteen

Grounds Twelve, Thirteen, and Fourteen allege claims of trial court error concerning the testimony of Christine Pace.

### Ground Twelve

James contends the state trial court abused its discretion in denying his motion for mistrial "when the State impermissibly introduced collateral crimes evidence," thereby violating his right to due process. (Dkt. 1 at 23). He alleges that his trial counsel objected

when Christine Pace testified that she had known James since 2001 and that in 2005 she learned that he was involved with drugs through her husband.   (*Id.*).

Asked how she knew to get in touch with James, Pace testified at trial that "in July my husband disappeared, and I knew he had been dealing with Darian."   (Dkt. 20, Resp. Ex. A15 at 342).   James' trial counsel objected and moved for a mistrial on grounds that July 2005 was not alleged in the charging document and that the witness testified to an uncharged crime in violation of James' right to a fair trial. (*Id.*).   The prosecutor argued that the State was not offering the evidence to prove an uncharged crime.   Rather, the witness was establishing some basis for what she knew to explain her initiation of contact with Darian.   (*Id.*)   The state trial court denied the motion for mistrial without elaboration.

James also argues that Pace did not recall specific dates. His counsel objected to Pace's testimony that she called James several times a day, told him what drugs she needed, and he told her whether he had the drugs.   Additionally, James alleges that his counsel objected to Pace's testimony that she met him several times a day and, on some occasions, met him at Brookside Apartments.   (*Id.*)   In addition, James alleges that Pace testified that he discussed a plan to sell drugs out of her house and that this conversation occurred in July 2005.   (Dkt. 1 at 24).   James argues that Pace's testimony constituted impermissible collateral crimes evidence and/or hearsay.   (*Id.*)

To the extent he contends that the state trial court abused its discretion in denying the motion for mistrial under state law, the claim is not cognizable on federal habeas review.   To the extent he argues that the witness' testimony constituted impermissible

collateral crime evidence. hearsay or irrelevant evidence, these claims also are not cognizable in this habeas proceeding. "As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence", because the state court has wide discretion in determining whether to admit evidence at trial". *Alderman v. Zant*, 22 F.3d 1541, 1555 (11th Cir. 1994). *See also Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court except where rulings deny petitioner fundamental constitutional protections). Violations of state law are not cognizable in a § 2254 proceeding unless they are of federal constitutional magnitude. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).

On direct appeal, James raised the state court's ruling on his motion for mistrial in state and federal terms. The state appellate court's decision is construed as an adjudication of the constitutional claim on the merits. Because the state appellate court issued a *per curia*m affirmance and the state trial court did not explain its reasons for denying the motion for mistrial, James has the burden to show there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

The state appellate court could reasonably conclude that Pace's testimony about matters occurring before August of 2005 did not render the trial fundamentally unfair. *See Lisenba v. California*, 314 U.S. 219, 236 (1941) (holding that in "a criminal trial, denial of due process" occurs when the "absence of [fundamental] fairness fatally infected the trial"). To constitute a denial of fundamental fairness, the evidence erroneously admitted at trial

must be material in the sense of a "crucial, critical, highly significant factor." *Jameson v. Wainwright*, 719 F.2d 1125, 1127 (11th Cir. 1983). Pace's testimony about her initial contact with James was offered to explain Pace's contact with James and not to prove James committed an uncharged crime. And while Pace could not recall specific dates of her phone conversations with James or her dealings with James in the summer of 2005 (Dkt. 20, Resp. Ex. A15 at 364), she testified that one of the phone calls with James occurred in October of 2005, within the time frame alleged in the information.

Viewing the evidence in its entirety, the testimony that James challenges did not so infuse the trial with unfairness as to deny him fundamental fairness and due process, as the State introduced other evidence of James' guilt that was sufficiently strong, including the testimony of Sidney Deloch and Tamiko James and the recorded phone conversations that did not contain James' conversations with Pace.

In view of the other strong evidence of James' guilt, the evidence of Pace's conversations and dealings with James that he challenges had no "substantial and injurious effect" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U. S. 619, 623 (1993). (a constitutional error will provide habeas relief only when a petitioner shows actual prejudice in that "the error 'had substantial and injurious effect or influence in determining the jury's verdict.'").

James fails to show that the state court's rejection of this ground was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts. Ground Twelve does not warrant relief.

43

**Grounds Thirteen through Fourteen**

In Ground Thirteen, James contends that the state trial court abused its discretion, thereby violating his right to a fair trial, by the introduction of Pace's testimony describing her condition when James supplied her with drugs. (Dkt. 1 at 25). In Ground Fourteen, James contends the state trial court denied him a constitutionally fair trial by the introduction of a handwritten note that Pace testified James wrote to her. (Dkt. 1 at 26). In Ground Fifteen, James alleges that the state trial court erred in allowing testimony that Pace received a cash deposit in her jail account. (Dkt. 1 at 27). Because he has not specified a federal constitutional violation, these claims are not cognizable in this federal habeas proceeding. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief.").

Further, any federal claim that could be construed from these claims is unexhausted, as James did not fairly present to the state appellate court the federal constitutional nature of these claims on direct appeal. (Dkt. 20, Resp. Ex. B1). A state prisoner does not fairly present a federal claim to a state court "if that court must read beyond a petition or a brief . . . that does not alert it to the presence of a federal claim." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). State procedural rules do not provide for successive direct appeals. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of a sentence). However, the Respondent does not argue these grounds are unexhausted and defaulted. Notwithstanding the exhaustion issue, the claims are meritless. *See* 28 U.S.C. § 2254(b)(2) (stating that a §

44

2254 petition "may be denied on the merits, notwithstanding the failure of the [petitioner] to exhaust the remedies available in the courts of the State").

**Ground Thirteen**

James alleges that the state court violated his right to a fair trial by abusing its discretion in allowing testimony that was irrelevant, inflammatory, and prejudicial to him. (Dkt. 1 at 25). Specifically, he contends that James' counsel objected when the prosecutor asked Christina Pace what her life was like when James was furnishing her drugs. (*Id.*).

Over his counsel's objection, Pace testified at trial, "It was living hell," because "[when you're an addict your every day depends on that next high. . . . So, then you become a hustler, I mean I lost a business by my addiction. I lost a home and my family by my addiction." (Dkt. 20, Resp. Ex. A15 at 347). After she testified that she had several sources during the time period and that James was the one with the most drugs, Pace testified over objection that her photograph on a chart was not who she is because "[t]hat woman was on drugs" and she was no longer on drugs. (*Id.* at 348–49).

Under Section 90.403, Florida Statutes, the trial court may exclude relevant evidence if the court determines that the probative value is outweighed by danger of unfair prejudice, confusion of the issues, or the potential to mislead the jury. § 90.403, Florida Statutes (2005). James argues that Pace's testimony about her condition when James was supplying her with drugs was not relevant, and alternatively, the probative value was outweighed by undue prejudice to him, as the sole purpose was to elicit sympathy from

45

the jury. (Dkt. 1 at 25). These arguments provide no basis for relief because this ground is based on perceived errors of state law for which habeas relief does not lie. *See Estelle v. McGuire*, 502 U.S. at 67–68. *See also Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (internal quotations and citations omitted).

The State, on direct appeal, argued that the testimony was relevant to the offense of trafficking in cocaine and supported Pace's testimony that she bought cocaine on some occasions more than once a day. (Dkt. 20, Resp. Ex. 2 at 26). Alternatively, the State argued that the testimony was harmless in light of the totality of the evidence. (*Id.*) Even if erroneous, the allowance of Pace's testimony did not deprive James of a fundamentally fair trial, as the State presented other relevant testimony from Pace and Tamiko James about James' drug transactions and conversations. Given also the evidence of the intercepted phone calls, Pace's testimony about her drug addiction and condition when she was photographed was harmless, having no substantial and injurious effect. *See Brecht*, *supra*, at 623. James is not entitled to relief on Ground Thirteen.

### Ground Fourteen

James alleges that the state trial court denied him a "constitutionally fair trial" by allowing the introduction of a handwritten note on a card that Pace testified James sent to

her while she was incarcerated in jail. (Dkt. 1 at 26). According to James, the State did not properly authenticate the note and did not establish that James wrote the note. (*Id.*)

At trial, Pace testified that James initiated contact with her by sending her the card when she was in jail. (Dkt. 20, Resp. Ex. A15 at 355–56). His counsel objected on grounds of a proper predicate and foundation. The state trial court overruled the objection and advised his counsel that he could cross-examine Pace about the note. (*Id.* at 356). Pace testified that the card was in the same or substantially the same condition as when she received it. Noting counsel's objection, the trial court allowed the note into evidence. (*Id.* at 358). She read to the jury the note that stated, "Keep your head up and your trap tight. He's got you. Check your account." The card was signed, "Quick," a name James used. (*Id.*)

James contends that introduction of the handwritten note was unduly prejudicial, as the State used the note to imply his consciousness of guilt and to show bad character. (Dkt. 1 at 27). These allegations present state law questions involving the admissibility of evidence under Florida law and are not cognizable claims for habeas relief. *Estelle v. McGuire*, *supra*.

In light of other substantial evidence of his guilt presented at trial, James has not demonstrated that the admission of his statement rendered the trial fundamentally unfair. Considering the overwhelming evidence of his guilt, including the intercepted calls and the testimony of Deloch and Tamiko James, the admission of the handwritten note had no

substantial and injurious influence in determining the jury's verdict. *Brecht*, 507 U.S. at 623. James is not entitled to relief on Ground Fourteen.

**Ground Fifteen**

James alleges that the trial court erred in allowing inadmissible hearsay evidence concerning a receipt for a cash deposit into Pace's canteen account. (Dkt. 1 at 27). He contends that the trial court agreed that the receipt was hearsay and sustained his counsel's hearsay objection. James further contends that the State ignored the trial court's ruling in introducing Pace's testimony that she received a deposit of $25 into her canteen account. (Dkt. 1 at 28).

To show that this evidence was offered to prove the truth of the matter asserted, James alleges that the prosecutor, in closing argument, argued both that James put the $25 in her account and that what Pace told the jury proved James' guilt beyond a reasonable doubt. (*Id.*)

To the extent James challenges the admission of the evidence under state law, the claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67–68.

In view of the other substantial evidence of his guilt, the introduction of Pace's testimony about the cash deposit did not render James' trial fundamentally unfair. Even if erroneously admitted, the testimony had no substantial and injurious effect or influence in determining the jury's verdict given the other substantial evidence of his guilt. *Brecht*, 507 U.S. at 637.

James is not entitled to relief on Ground Fifteen.

48

**Ground Sixteen**

James alleges that the state trial court erred in denying his motion for judgment of acquittal at the close of the State's case. (Dkt. 1 at 28). He argues that the State failed to present competent or substantial evidence that he was associated with an enterprise or was engaged in two predicate acts to support a conviction for racketeering. (*Id.*)

James also argues that the State did not present substantial evidence that he conspired to engage in a pattern of racketeering. In addition, he argues that the State failed to present competent evidence that he constructively possessed a trafficking amount of cocaine or a firearm. (Dkt. 1 at 30). He argues that the only evidence presented was his presence in the apartment and his proximity to the items. He contends that the State did not present sufficient evidence of his knowledge or dominion and control over the items. (*Id.*)

James raised the federal constitutional dimension of this ground on direct appeal. The state appellate court's *per curiam* affirmance warrants deference under Section 2254(d) as an adjudication on the merits.

To satisfy the constitutional requirement of due process in a criminal trial, the state must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant. *In re Winship*, 397 U.S. 358, 364 (1970). When considering the sufficiency of the evidence on review, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable

doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted). The court will not reweigh the evidence. *Id.*, 443 U.S. at 319.

To establish a substantive racketeering charge under § 895.03(3), Florida Statutes:

> [T]he State must prove the defendant's "(1) conduct or participation in an enterprise through (2) a pattern of racketeering activity." *Doorbal v. State*, 983 So.2d 464, 492 (Fla. 2008). "Racketeering activity" is "defined to include certain specified crimes under state law and under the federal RICO Act," . . . *Carlson v. State*, 405 So. 2d 173, 174 (Fla.1981); § 895.02(1)(b), Fla. Stat. (2003); 18 U.S.C. § 1961(1). These specified crimes are typically called predicate acts. Thus, the State must establish a "pattern of racketeering activity" by presenting evidence that the defendant engaged in at least two predicate acts that have the same or similar intents, results, accomplices, victims, or methods of commission. *See Morgan v. State*, 117 So. 3d 79, 81–82 (Fla. 2d DCA 2013); *Sanchez v. State*, 89 So .3d 912, 914 (Fla. 2d DCA 2012).

*de la Osa v. State*, 158 So.3d 712, 725 (Fla. 4th DCA 2015).

An "enterprise," is defined as "any . . . group of individuals associated in fact although not a legal entity[.]" § 895.02(3), Florida Statutes (2005). To prove an enterprise, the State need only establish two elements: (1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit." *Gross v. State*, 765 So. 2d 39, 45 (Fla. 2000) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "The evidence used to establish the pattern of racketeering element may very well be the one used to establish the enterprise element." *See Gross*, 765 So. 2d at 45 (citing *Turkette) (additional citation omitted*

50

Contrary to James' argument, the State presented sufficient evidence to find he was engaged in an enterprise, as utilized in the state racketeering statute. The evidence of the intercepted calls showed that James was associated with his family members for the purpose of making money from repeated criminal activity. Although he points out that Sidney Deloch testified Deloch worked alone and not with James, Deloch also testified that he knew James was selling cocaine during the period from August to November of 2005, and that Deloch loaned James money during that time. (Dkt. 20, Resp. Ex. A15 at 255). And Deloch testified that the money that he loaned James came from the sale of cocaine. (*Id.* at 313). In addition, Deloch testified that he talked daily on the telephone with James and that Deloch used the telephone to further his business of selling drugs. (*Id.* at 138). The State introduced intercepted telephone calls and in five calls between James and Deloch drugs and money were discussed. (*Id.* at 276-81).

Christine Pace testified that she obtained cocaine from James in the latter part of 2005. She explained her procedure of obtaining cocaine from James, utilizing code words on phone calls. (*Id.* at 343-45). Tamiko James testified that he received cocaine from James and that James obtained cocaine from James Nicholas. (*Id.* at 388, 394).

Detective Peter's testimony revealed that James and his associates shared the purpose of obtaining cocaine and manufacturing crack cocaine for distribution. The evidence shows they carried out this purpose through their participation in the alleged predicate acts. They discussed the procurement of cocaine and in their intercepted conversations used terminology to conceal their common criminal purpose of obtaining

51

and distributing cocaine and reinvesting drug proceeds in more cocaine. From the evidence, a jury could conclude that James and his associates shared the requisite common purpose of an ongoing organization. *Gross*, 765 So. at 46 (citng *United States v. Lemm*, 680 F.2d 1193, 1199 (8th Cir.1982).

The State also proved that the organization with which James was associated functioned as a continuing unit, satisfying the second sub-element of the enterprise requirement. "Continuity [of an alleged RICO enterprise] exists where an unchanging pattern of roles is necessary and utilized to carry out the predicate acts of racketeering." *Id.* at 46. The competent substantial evidence supports a finding that Sidney Deloch and James Nicholas carried out a supply function in the organization and that Darian James assumed a manufacturing and distribution function. This pattern of roles constitutes sufficient proof of the requisite continuity.

James argues that the State did not present evidence that he participated in a pattern of racketeering activity by engaging in at least two incidents of racketeering conduct. *See* §§ 895.02(4), 895.03(3), Fla. Stat. (2005). However, the record shows the State presented sufficient evidence of at least two predicate acts. (Dkt. 20, Resp. Ex. F6 at 11). At trial, the State presented testimony that Darian James manufactured crack cocaine and packaged and distributed crack cocaine to others, including Christina Pace and Tamiko James. His intercepted phone discussions with codefendants and others about cocaine constituted evidence of his participation in conspiracy to possess or deliver cocaine, a predicate act alleged in the racketeering count. As to the last two predicate

acts (Dkt. 20, Resp. Ex. A15 at 799–800), the testimony established that James was in possession of a trafficking amount of cocaine and a firearm when the search warrant was executed.

James argues that the State failed to present competent evidence that he was a member of a conspiracy to engage in racketeering, count two. He is not in custody on that count. The state appellate court reversed his conviction for conspiracy to commit racketeering.

As to counts ten and eleven, the State presented sufficient evidence — including testimony that James cooked cocaine in the Morro Manor apartment and that he was present when police found quantities of cocaine, cooking pots, an electric bill in James' name and the firearm (Dkt. 20, Resp. Ex. A9) — to support the findings that James constructively possessed both a trafficking amount of cocaine and the firearm.

Viewing the evidence in the light most favorable to the prosecution, the jury could have found the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319. James is not entitled to relief on Ground Sixteen.

Any of James' claims not specifically addressed in this Order have been determined to be without merit.

Accordingly, it is **ORDERED** that James' petition for writ of habeas corpus (Dkt. 1) is **DENIED**. The Clerk is directed to enter judgment against Darian James and to **close** this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

It is **ORDERED** that James is not entitled to a certificate of appealability (COA). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). A COA must first issue. *Id.* To merit a COA, James must show that reasonable jurists would find debatable both (1) the merits of an underlying claim, and (2) the procedural issues that he seeks to raise. *See* 28 U.S.C. § 2254(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). James has not made the requisite showing. Because James is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** at Tampa, Florida, on September 24, 2018.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Darian D. James
Counsel of Record